IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| EVERGREEN INTERNATIONAL | ) Case No. 13-13364 (MFW) |
| AVIATION, INC., *et al.*[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) **Re: Docket No. 229** |

**DECLARATION OF ALFRED T. GIULIANO IN SUPPORT OF MOTION OF
ALFRED T. GIULIANO, CHAPTER 7 TRUSTEE, FOR APPROVAL OF THE (A) SALE
OF SUBSTANTIALLY ALL OF THE ASSETS OF EVERGREEN AVIATION GROUND
LOGISTICS ENTERPRISE, EVERGREEN INTERNATIONAL AVIATION, INC.,
EVERGREEN INTERNATIONAL AIRLINES, INC., EVERGREEN TRADE, INC.,
AND SUPERTANKER SERVICES, INC. FREE AND CLEAR OF ALL LIENS AND
CLAIMS, (B) ASSUMPTION AND ASSIGNMENT OF DESIGNATED
CONTRACTS AND LEASES TO JET MIDWEST GROUP, LLC, AND
(C) GRANTING RELATED RELIEF AS IS NECESSARY**

I, Alfred T. Giuliano, make this declaration and state:

<u>Experience/Background</u>

1.       I am a founding member of Giuliano, Miller, & Company, LLC

(*"GMCO"*). GMCO is a certified public accounting and financial consulting firm. I have over

thirty years experience as a certified public accountant. I am a recognized expert in the fields of

bankruptcy and litigation support. I have provided services to a broad range of wholesale, retail,

and service clients in various industries such as healthcare, casino gaming, homebuilding, hotel

and hospitality, digital television, information technology, commercial real estate, subprime

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Evergreen International Aviation, Inc. (9079); Evergreen Aviation Ground Logistics Enterprise, Inc. (6736); Evergreen Defense & Security Services, Inc. (0118); Evergreen International Airlines, Inc. (7870); Evergreen Systems Logistics, Inc. (0610); Evergreen Trade, Inc. (0952); and Supertanker Services, Inc. (3389). The Debtors' address is 3850 Three Mile Lane, McMinnville, Oregon 97128.

lending, aircraft, credit card services, and restaurants. I have rendered services to trustees, debtors-in-possession, and unsecured creditors committees.

2.       I have advised many companies in formal reorganization processes and out-of-court turnaround situations. I have evaluated their operations, determined their break-even sales level, identified unprofitable business lines and sectors, implemented systems of cash management and analyzed specific areas for cost control.

3.       GMCO specializes in bankruptcy and restructuring, litigation support, and fraud and forensic investigations. The employees at GMCO hold advanced degrees and specialty certifications in multiple areas, including insolvency and restructuring, fraud and forensic investigations, and business valuation. GMCO has a high level of diversity and expertise that is usually limited to large international and regional firms. GMCO's staff has a broad range of experience in both public accounting and private industry, including the "Big Four" accounting firms and Fortune 500 Companies.

4.       I have been a chapter 7 Panel Trustee for the District of Delaware since my appointment to the Panel in 2002. In that capacity, I have administered hundreds of cases. I have liquidated assets ranging from entire operating entities to individual assets for companies located throughout the United States. I have also served as a Court- Appointed Examiner and Liquidating Trustee in other bankruptcy cases, and a State Court Receiver.

5.       As a litigation expert, I have testified numerous times with respect to damages, solvency, business valuation, and causation. I have frequently testified in bankruptcy court matters.

2

6.      I have a bachelor of science in accounting and a bachelor of arts in business management, each from Widener University. In addition, I am a Certified Public Accountant, Certified Fraud Examiner, Certified Insolvency and Restructuring Advisor, and Certified in Distressed Business Valuation.

7.      If I were called to testify, I would testify that I am familiar with the former business operations of the Evergreen Debtors and their books and records and assets, which are the subject of the sale before the Court today.

**Sale Process**

8.      After my appointment, certain employees of GMCO and I visited Evergreen's former headquarters located in McMinnville, Oregon. During this time, I and those employees of GMCO under my supervision met with former employees of Evergreen for the purpose of gaining an understanding of Evergreen's former business operations and the various assets and other property used in the business. After these meetings, I hired certain of Evergreen's employees for the purpose of readying the Debtors' assets for sale to a single or multiple buyers.

9.      Evergreen and its affiliated Debtors were unable to continue, and ceased their operations, prior to commencing this bankruptcy case. At no time since the petition date were the Trustee or the Debtors generating sales or conducting operations. On the petition date, the Debtors' assets were located around the United States in 21 different locations – 19 airports, the Penal Park (Marana Aerospace), and McMinnville, Oregon. I learned that some of the assets

3

in the various airports were not well secured. I determined that the assets had to be sold as soon as possible to preserve and maximize value and reduce administrative expenses.

10.    I would testify that, as set forth in detail in the Final Cash Collateral Order, the Debtors are indebted to their secured lenders pursuant to (i) the First Lien Credit Documents in the principal amount of $11,105,061.50, plus any accrued and unpaid interest and additional fees and expenses, and (ii) the Second Lien Credit Documents in the principal amount of $89,057,243.79, plus any accrued and unpaid interest and additional fees and expenses. The lenders are secured in substantially all of the Debtors' assets.

11.    I would also testify that under the Final Cash Collateral Order the Lenders have allowed the estates to pay over $600,000 to hourly workers, ongoing expenses of keeping the estates open (including payment of rent to Marana as Ordered by this Court), carve outs for professional fees, and an additional $250,000 to the estates. All told, the Lenders have permitted the use of more than $2,000,000 of their cash collateral to be used for the benefit of these estates.

12.    I would further testify that the assets that I am seeking to sell are generally in three buckets: those assets located in the Marana facility, those assets located in the 19 other airports, and those assets located in McMinnville. The estates' assets located at the Marana facility are in 3 places: (i) the warehouse and real property subject to the current Trade Lease for which rent has been paid through May 30, 2014, as ordered by this Court; (ii) the warehouse and real property subject to the former Airlines Lease; and (iii) real property at the

Penal Park that is not subject to either the former Airlines Lease or the current Trade Lease on which the Supertanker is located.

13.    In order to preserve value, I started to market the debtors' assets for sale, and I received approximately 9 offers to purchase some or all of Evergreen's assets – 3 of these offers were from liquidators.  During this time, I developed the view that a sale of the Debtors' assets to multiple buyers would be difficult and costly because the assets are located at approximately 21 locations around the country. The travel to each of these restricted sites, on multiple occasions, would be both expensive and administratively daunting.  As a result, I focused my sale efforts on potential buyers that were interested in purchasing all of the Debtors' assets "as-is" and "where is" and who would either begin using the assets in their current location or remove them to use as part of the buyer's existing business operations.

14.    On February 6, 2014, I was contacted by Jet Midwest about purchasing some or all of the Debtors' assets. On February 12, 2014 I met with Eric Haymes of Jet Midwest to discuss their interest in the assets. Jet Midwest traveled to the McMinnville, Oregon facility and to substantially all of the Debtors' other facilities including Anchorage, Alaska and Honolulu, Hawaii for the purpose of reviewing the assets so that Jet Midwest could determine if it wanted to make an offer to me on behalf of the Debtors' estates. Over the course of several weeks, my counsel and I negotiated the purchase price of the Debtors' assets with Jet Midwest in addition to other terms regarding the sale.

DOCS_DE:193453.1 31265-001

## Entry into Jet Midwest APA

15.     On April 21, 2014, I, as trustee of the Debtors' estates, entered into an Asset Purchase Agreement (the "APA") with Jet Midwest to purchase substantially all of the Debtors' assets for a purchase price of $4,300,000, which could be as low as approximately $4 million or as high as approximately $5 million, subject to various purchase price adjustments.

16.     Only assets that are property of the Debtors' estates are being sold under the APA. As set forth under the APA, the purchase price is subject to certain adjustments: (a) if assets owned by the EAGLE Debtor are not turned over, the purchase price will be adjusted downward (based on 60% of the fair market value of the applicable assets) but no more than $250,000 in the aggregate; (b) if I am able to deliver the Supertanker located in Arizona within 180 days after the closing of the sale, the purchase price will be increased by $250,000; and (c) if I am able to deliver three of the fly-away kits within 180 days after the closing, the purchase price will be increased by $125,000 per fly-away kit.

17.     In connection with the entry into the APA, I determined that it would be more beneficial to the Debtors' estates to enter into a private sale transaction with Jet Midwest as opposed to auctioning the Debtors' assets, which private sale is subject to higher and better bids that could be received through today. I believe that the private sale to Jet Midwest is better for the estates because (a) an auction likely would not result in the sale of all of the Debtors' assets; (b) it would require me to hire a liquidator or auctioneer to administer the inspection and sale of assets all over the country, which would be both time consuming and expensive; (c) it would expose the estates to other potential administrative cost associated with storing and moving the

DOCS_DE:193453.1 31265-001

assets to locations where they could be auctioned and sold; and (d) ultimately would result in lower net sale proceeds to the estate. I believe that the Debtors' assets do not lend themselves to the typical marketing process because they are located all over the country and 19 airports, including Anchorage, Alaska and Honolulu, Hawaii, which also creates logistical problems arising from the difficulties of having personnel travel to the 19 different airport sites to provide due diligence for each potential buyer, providing access due to the security protocols at airports, and also because the assets are highly specialized assets.

18.       Accordingly, I believe that the offer from Jet Midwest is the highest and best offer available because it will result in the certain sale of all of the Debtors' assets in exchange for a purchase price the is representative of the fair market value of the assets in the context of a chapter 7 liquidation and acceptable to the secured lender.

19.       I would testify that there were extensive arms' length negotiations between myself and Jet Midwest, with participation from sophisticated advisors, all of whom acted in good faith at all times. Neither Jet Midwest, nor any affiliate of Jet Midwest, is an insider within the meaning of 11 USC Section 101, and is not controlled by, or acting on behalf of, any insider of the Debtors or affiliate of the Debtors, and there is no common identity of directors or officers among the Debtors and Jet Midwest. Further, Jet Midwest is not a creditor of the Debtors' estates, (Jet Midwest does owe the Debtors' estates $45,000.00 from prepetition services) and there are no "side deals" between Jet Midwest and the Trustee or the Debtors or any officer, director or employee of any of them.

7

20.      To ensure that the Debtors' estates received the highest and best bid, I continued to entertain offers from other parties after the execution of the APA. After the filing of the sale motion, I received two inquiries but neither of those potential bidders ever provided me with a concrete offer that I recognized as higher and better.

21.      If I were called to testify, I would testify that the sale of the Debtors' assets is supported by sound business purpose because the gross sale proceeds will yield at least $4 million and up to approximately $5 million to the estates, with carve-outs provided by the secured lenders that will benefit priority creditors and other administrative expenses of the Debtors' estates, approximately $500,000 has been carved out to pay for the Anchorage Litigation (with potentially $1,000,000 more), and $800,000 will be carved out for professional fees as provided in the Final Cash Collateral Order (that will be amended by a separate motion to to increase the carve out to $900,000). In addition, the secured lenders have already agreed to pay up to $600,000 for hourly workers of the Debtors who were not paid their final paycheck before the Debtors filed their chapter 7 petition (priority wage claims).

22.      I would testify that (i) the Debtors' estates have no further use for the assets, having ceased all operations; (ii) the purchase price is fair and reasonable; (iii) the sale price is fair and reasonable; (iv) the assets will substantially diminish in value if not immediately sold; (v) no insider will profit from any side arrangement with Jet Midwest; (vi) there was no collusion with any party at any time in negotiating the terms of the APA; (vii) to the best of my knowledge, Jet Midwest has acted in good faith; and (viii) notice was given as required to parties in interest including all known lienholders.

9

23.    If the Sale is not approved, the Debtors would be forced to abandon their assets because I as trustee do not have sufficient unencumbered funds to further market the assets for sale on a piecemeal basis, which would yield far less, if anything, to the estates.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 29 , 2014

Alfred T. Giuliano
Chapter 7 Trustee

9