IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EVERGREEN INTERNATIONAL<br>AVIATION, INC., *et al.*[1]<br><br>　　　　　Debtors. | Chapter 7<br><br>Case No. 13-13364 (MFW)<br><br>Jointly Administered<br><br>**Re: Docket Nos. 738** |

### CHAPTER 7 TRUSTEE'S OPPOSITION TO EMERGENCY MOTION OF LENDERS FOR ENTRY OF AN ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO PURSUE CLAIMS ON BEHALF OF THE ESTATES

Alfred T. Giuliano, the chapter 7 trustee (the "Trustee") to the estates of the above-captioned debtors (the "Debtors"), hereby opposes the *Emergency Motion of Lenders for Entry of an Order Granting Leave, Standing, and Authority to Pursue Claims on Behalf of the Estates* (the "Motion") [Docket No. 738].[2] For the reasons set forth below, the Trustee respectfully requests that the Court deny the Motion.

### Introduction

The Lenders have liens on virtually all of the Debtors' assets. Upon his appointment, the Trustee undertook to identify claims that would benefit the Debtors' unsecured creditors. After conducting his investigation, he identified a handful of potential claims, selected

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Evergreen International Aviation, Inc. (9079); Evergreen Aviation Ground Logistics Enterprise, Inc. (6736); Evergreen Defense & Security Services, Inc. (0118); Evergreen International Airlines, Inc. (7870); Evergreen Systems Logistics, Inc. (0610); Evergreen Trade, Inc. (0952); and Supertanker Services, Inc. (3389). The Debtors' address is 3850 Three Mile Lane, McMinnville, Oregon 97128.

[2] The "Lenders" are 10th Lane Finance Co LLC, Centre Lane Partners, LLC, Cetus Capital II LLC, Watershed Capital Institutional Partners III, L.P., Watershed Capital Partners (Offshore) Master Fund II, L.P., Watershed Capital Partners (Offshore) Master Fund, L.P., ZM Private Equity Fund I LP, ZM Private Equity Fund II LP.

1

the most promising and had his counsel draft complaints to facilitate the negotiation of a settlement. Two of these causes of action were based on the Airplane Transfer and the Helicopters Transfer (defined below) that the Lenders now assert are the basis of alleged malpractice claims against the Debtors' former lawyers. The Trustee shared those complaints with the Lenders about 15 months ago and informed them of the weakness of those claims.

The Trustee ultimately concluded that prosecuting actions based on the Airline Transfer and the Helicopters Transfer would not benefit the Debtors' estates. This is reason the Trustee decided to negotiate a potential settlement with several parties including Evergreen Holdings, Inc. that would have potentially generated in excess of $2,000,000.

Pursuant to the Motion, the Lenders contend that the Debtors' former lawyers, Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden"), committed malpractice in connection with the Airline Transfer and the Helicopters Transfer, that the Trustee breached his duties to the estate by failing to sue Skadden and ask the Court to give them standing to sue Skadden. The Lenders seek 75% of the recovery, *after* payment of fees and expenses. The Court should deny the Motion.

First, as the underlying purported fraudulent transfers (above), only involved the Lender's collateral, the transfers did not cause damages to the unsecured creditors of the estates, but rather only increased the deficiency claim of the Lenders. Accordingly, the purported fraudulent transfers did not damage the estates' unsecured creditors or deplete the estates from their standpoint and therefore, even if Skadden was negligent in connection with those transactions, unsecured creditors, whose interests the Trustee represents, were not harmed.

Second, the Trustee has not refused to prosecute the alleged malpractice claims. In spite of the Trustee's concerns about their viability, because of the Lenders' concerns, the

Trustee retained special counsel (Steve Coren of Kaufman Coren & Ress)—subject to court approval—to conduct an independent investigation into claims against the Debtors' former professionals, including Skadden. That investigation is ongoing, and the Trustee will report back to the Lenders and the Court at its conclusion. The Lenders' request for derivative standing is therefore fatally defective as a matter of law. *See In re Cybergenics Corp.*, 330 F.3d 548 (3d Cir. 2003) (court's equitable powers authorize granting derivative standing to a committee of unsecured creditors to prosecute avoidance actions on behalf of the debtor's estate only where a debtor-in-possession unreasonably refuses to pursue an avoidance claim). Finally, there is no emergency. The Trustee, through his special counsel, has entered into a tolling agreement with Skadden which preserves the status quo pending the investigation. Accordingly, the Trustee respectfully requests that the Court deny the Motion.

## Statement of Facts

1. Lenders seek standing to "pursue, prosecute and settle the estates' alleged claims, including claims for legal malpractice against Skadden, and certain of its attorneys in connection with its representation of the Debtors and other entities in multiple transactions in which which assets were allegedly diverted to insiders at the expense of creditors prior to the commencement of this bankruptcy proceeding." Motion, at 1. The Lenders' failure to attach a draft complaint to the Motion or to clearly describe the basis of the alleged claims against Skadden make it impossible to determine the precise basis of the purported "claims" against Skadden, but the Lenders essentially argue that Skadden represented Delford Smith ("Smith") and numerous other debtor and non-debtor entities related to Smith in connection with two purported fraudulent transfers (the Helicopters Transfer and the Airplanes Transfer (defined

3

below)), that these transfers damaged the Debtors' estates, and that Skadden breached its duties by its representation of multiple entities in these transactions (the "Alleged Skadden Claims"). They seek standing to prosecute the Alleged Skadden Claims, contending the Trustee has failed to properly investigate the claims, refuses to prosecute the claims and the applicable statutes of limitations will expire on April 1, 2016. None of these contentions is true.

**A.     The Trustee investigated the claims.**

2.      As is set forth in the *Declaration of Alfred T. Giuliano* (the "Giuliano Dec."), the Trustee investigated both transactions. Shortly after his appointment in January 2014, the Trustee traveled to the Debtors headquarters in McMinnville, Oregon to commence his investigation into the Debtors' financial affairs. He met with and interviewed the chief financial officer, the chief executive officer, in house general counsel, several controllers for the various debtor entities and others to determine, among other things, whether the Debtors had any unencumbered assets, and whether there were any avoidance actions or other causes of actions, such as claims against officers and directors, that could be pursued for the benefit of the estates' unsecured creditors. Because of all of the interrelated parties in these cases, the Trustee also analyzed intercompany and related party transactions.

3.      As a result of this investigation, including his review of the Debtors' books and records, their schedules and statements and the interviews he conducted, the Trustee concluded, based on his review, as well as a memorandum prepared and legal research conducted by his counsel, that the Lenders held liens on substantially all of the Debtors' assets, which secured approximately $100 million in debt, and he estimated the value of the Lenders' collateral

4

was approximately $25 million. The Trustee, with the assistance of counsel, also identified a number of pre-petition transfers that he thought merited additional due diligence. These transfers included the Airplane Transfer and the Helicopters Transfer that Lenders allege are the basis of a malpractice claim against Skadden.

4. In February of 2014, Donna Miller of Giuliano, Miller & Co, and Jeremy Richards of Pachulski Stang Ziehl & Jones flew out to the Debtor's facilities in Oregon to perform additional research and analysis on the existence of claims against third parties that would benefit the estates' unsecured creditors, including non- debtor affiliates. They interviewed the Debtor's in-house counsel, Andrea Avolio, among others, and obtained and reviewed myriad documents related to the Debtors' pre-petition transfers and related-party transactions

5. In April of 2014, counsel to the Trustee requested and obtained approximately 20 boxes of documents and electronic files of emails from Skadden after requesting Skadden's files related to the Debtors.

6. The Trustee conferred with counsel and reviewed memoranda prepared by them to determine whether the estates had any bona fide causes of action against anyone, and if so, whether the prosecution of the claims would benefit the estates' unsecured creditors, in light of the fact that the Lenders had liens on virtually all of the Debtors' assets and were woefully undersecured. The Trustee also considered whether a defendant could satisfy a potential judgment and the estimated cost of litigation.

**B.     The Airplane Transfer**

7.     The Trustee's investigation and analysis revealed that in April 2013, non-debtor, Evergreen Vintage Aviation, Inc. ("Vintage"), transferred two airplanes to another non-debtor, the Michael King Smith Foundation (the "Foundation"). Evergreen Holdings, a non-debtor ("Holdings") owned Vintage, which is also not a debtor in these bankruptcy cases, and the Trustee lacks standing to bring a malpractice action against Skadden on behalf of Vintage.

8.     Debtor Evergreen Aviation, Inc. ("Aviation") was a creditor of Vintage as of the Petition Date. Accordingly, in October of 2014, the Trustee's counsel drafted a complaint against both Vintage and the Foundation alleging an intercompany receivable due from Vintage of $55 million (based on its general ledger statement) and avoidance of the Airplane Transfers from Vintage to the Foundation. *See Draft Complaint to (A) Collect on a Debt; and (B) Avoid Fraudulent Transfers to Extent Necessary to Satisfy That Debt* (the "Draft Vintage Complaint"), a copy of which is attached hereto as **Exhibit A**. The Lenders had a lien on Aviation's intercompany receivable from Vintage.

9.     In November 2014, the Trustee attempted to negotiate a settlement of the Debtors' claims against Vintage. On December 5, 2014, Trustee's counsel advised Lenders' counsel as to the status of those negotiations and provided him a copy of Draft Vintage Complaint (as well as a draft complaint related to the Helicopters Transfer). *See* email from Bradford J. Sandler to Curtis Tuggle dated December 5, 2014, which is attached hereto as **Exhibit B**.

6

10. On December 11, 2014, however, before any settlement could be reached, Vintage filed its own chapter 11 case, which is still pending in the United States Bankruptcy Court for the District of Oregon (Case No. 14-36770-rld11). The automatic stay now prohibited the Trustee from suing Vintage, so the Trustee prepared a proof of claim based upon the Vintage Complaint, which he timely filed on March 25, 2015. *See* Proof of Claim No. 4, a copy of which is attached hereto as **Exhibit C**. In its bankruptcy schedules, Vintage listed Aviation as being owed approximately $5 million, with Holdings being owed $52 million. In addition, according to Aviation's audited financial statements as of 2/28/13, Aviation only reflected a receivable of approximately $2 million.

C. **The Helicopters Transfer**

11. The Trustee's investigation and analysis revealed that in May of 2013, Aviation sold all the stock of one of its wholly owned subsidiaries, Evergreen Helicopters, Inc. ("Helicopters"), to Erickson Air-Crane Incorporated ("Erickson") (the "Helicopters Transaction") for approximately $250 million in cash, stock and other consideration. The Chairman of the Board of Erickson at the time of the acquisition was Quinn Morgan, who also owned one of the Lenders.

12. The Lenders had a lien on Aviation's stock in Helicopters. They consented to and were the primary beneficiaries of the sale. The first lienholders (Wells Fargo) were paid $137 million in cash plus preferred stock. The second lien lenders received preferred stock valued at #33 million at closing. Aviation received only $9.6 million of the proceeds of the sale.

7

13. The Trustee identified three parts of the transaction in which it appeared that some consideration was paid to a Smith affiliate. Specifically, (a) $13 million payment that Erickson paid Ventures Acquisition Company, LLC ("Ventures") to purchase nine aircraft; (b) $6.8 that Erickson prepaid to Ventures to payoff remaining future lease obligations on three additional aircraft that were returned to Ventures at closing, and (c) $2.6 million that Erickson paid at closing for prepayment of a three-year lease of certain facilities located in McMinnville, Oregon and owned by Evergreen Holdings, Inc. ("Holdings"), Aviation's parent company, of which Mr. Smith was the majority owner. It was later determined that the lease payment was made to Aviation; therefore, there was no harm.

14. Because the Trustee was concerned that consideration was diverted from Aviation to entities controlled by Smith, in October of 2014, the Trustee's counsel drafted a complaint against Smith, Ventures and Holdings for avoidance of fraudulent transfers and for breach of fiduciary duty. *See Complaint to (A) Avoid Fraudulent Transfers; and (B) Recover Fraudulent Transfers or the Value Thereof and (C) Breach of Fiduciary Duty* (the "Draft Helicopters Complaint"), a copy of which is attached hereto as **Exhibit D**.

15. In November of 2014, the Trustee also attempted to negotiate a settlement of the Debtors' claims related to the Helicopters Transaction. On December 5, 2014, Trustee's counsel advised Lenders' counsel as to the status of those negotiations and provided him a copy of Draft Helicopters Complaint. *See* email from Bradford J. Sandler to Curtis Tuggle dated December 5, 2014, which is attached hereto as **Exhibit B.**

DOCS_DE:205947.3 31265/001

16. Since the Lenders had a lien on the Helicopters stock, any consideration paid for the stock that may have been diverted to non-debtor entities did not damage unsecured creditors, as it would have been paid to Lenders in connection with the sale. The Trustee therefore requested that the Lenders fund an investigation of these potential causes of action, but Lenders declined. After consultation with counsel, the Trustee ultimately concluded that prosecuting the claims would not be in the best interests of the estates.

D.  **The Trustee has not refused to prosecute the Alleged Skadden Claims.**

17. At no time during the Trustee's investigation of the Helicopters Transfer or the Airplane Transfer did the Trustee or his counsel ever review any documentation or discover any information that lead him to believe that Skadden had represented or advised any of the Debtors in connection with any transaction that damaged the Debtors' unsecured creditors. It does not appear as though either of the transfers resulted in a diminution of the estate from the standpoint of unsecured creditors. At most, they increased the Lenders' deficiency claim. Accordingly, it appears that any alleged malpractice did not harm the Debtors' unsecured creditors.

18. When Lenders expressed concerns over Skadden's pre-petition representation of multiple parties, however, and potential conflicts of interest, out of an abundance of caution, the Trustee retained (subject to bankruptcy court approval), Kaufman, Coren & Ress, P.C. as his special counsel to conduct a further evaluation, which is ongoing.[3] To

---

[3] See Application of Alfred T. Giuliano, Chapter 7 Trustee, Pursuant to Bankruptcy Code Sections 327(a) and 328(a), Bankruptcy Rule 2014(a), and Local Rule 2014-1 for Authority to Employ and Retain Kaufman, Coren & Ress, P.C. as Special Counsel to Investigate Claims of the Estates, Nunc Pro Tunc to February 11, 2016 [Docket No. 735].

the extent claims against Skadden are revealed that may benefit the estates' unsecured creditors, the Trustee has not refused to bring them.

E. **The statutes of limitations are not in danger of expiring.**

19. There is no danger that any statute of limitations will expire before the Trustee's special counsel completes his investigation because the Trustee has obtained a tolling agreement from Skadden which provides, "The parties agree that the running of any statute of limitations or any other defense based on the passage of time with respect to all claims, that have not already lapsed or expired, that could be asserted by or on behalf of the Trustee against Skadden or Mr. Goffman shall be extended for a period to the earlier or (i) sixty (60) days from March 7, 2016 until and including May 6, 2016, or (ii) the granting of the [Standing] motion, or any other motion giving any party other than the Trustee the right to bring a claim against Skadden or Mr. Goffman." Therefore, the status quo will be maintained pending Mr. Coren's evaluation of the Alleged Skadden Claims.

## Relief Requested

20. For the reasons set forth below, the Trustee requests that the Court deny the Motion.

## Argument

A. **The Trustee has fulfilled his fiduciary duties in connection with the Alleged Skadden Claims.**

21. It is the Trustee's responsibility to protect the unsecured creditors in these cases, not the interests of secured creditors. *See e.g., Matter of Trim–X, Inc.*, 695 F.2d 296, 301

10

(7th Cir. 1982); *Barber v. McCord (In re Pearson Industries, Inc.)*, 178 B.R. 753, 761 (Bankr. C.D. Ill. 1995). The Trustee has fulfilled his duties to unsecured creditors.

22.    It is not the Trustee's job to prosecute causes of action for the sole benefit benefit of secured creditors, and he does not breach his fiduciary duties by refusing to do so. As the Third Circuit recently noted when it affirmed the bankruptcy court's refusal to grant derivative standing to a chapter 13 debtor to prosecute an action to set aside as fraudulent a pre-petition foreclosure sale:

> The Trustee and the Bankruptcy Court agreed that avoiding the foreclosure sale would bring no benefit to the estate because there would be insufficient equity in the property once existing liens, exemptions, and costs were taken into account to leave any funds for creditors. The District Court did not clearly err in reaching the same conclusion. Weyandt has offered no alternative account explaining how a sale would benefit her creditors. It appears, therefore, that the Trustee did not violate any of her duties in failing to pursue an avoidance action. Weyandt is thus not entitled to derivative standing and the Bankruptcy Court was correct to dismiss her adversary action.

*In re Weyandt*, 544 Fed. Appx. 107, 110 (3d Cir. 2013).

23.    Lenders have a lien on substantially all of the Debtors' assets. With respect to the underlying causes of action (the Airline Transfer and the Helicopters Transfer), the Trustee properly exercised his business judgment not to prosecute these claims because there would be no benefit to unsecured creditors. Pursuing claims for the sole benefit of a secured creditor with a lien on the recovery does not benefit a chapter 7 debtor's estate. *See Cong. Credit Corp. v. AJC Int'l*, 186 B.R. 555, 559 (D.P.R. 1995) (holding where unsecured creditors would not receive any proceeds from an avoidance action on which a judgment creditor held a lien, it provided no "benefit to the estate" for the purpose of Bankruptcy Code section 550); *In re*

*Pearson Industries*, 178 B.R. at 766; *Nathan v. Brownstone Plastics, LLC*, 511 B.R. 863, 869 (E.D. Mich. 2014) ("[W]here the property transferred has a security interest over and above the value of the property, the weight of authority dictates that a trustee may not recover because the estate would not benefit.").

24. With respect to the Alleged Skadden Claims, the Trustee has not refused to bring them and has retained special counsel to conduct a further investigation to determine if prosecuting the Alleged Skadden Claims will be of any benefit to the Debtors' unsecured creditors. There is no reason to "subvert scheme envisioned by the Bankruptcy Code" and grant derivative standing to Lenders where the Trustee is carrying out his fiduciary responsibilities to unsecured creditors.

B. **The Trustee has not refused to bring the Alleged Skadden Claims. Therefore, the Court must deny the Motion.**

25. In *In re Cybergenics Corp.*, 330 F.3d 548 (3d Cir. 2003), a divided en banc panel for the Third Circuit held in the context of a chapter 11 case:

> We believe that sections 1109(b), 1103(c) and 503(b)(3)(B) of the Bankruptcy Code evince Congress's approval of derivative avoidance actions by creditor' committees, and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession **unreasonably refuses** to pursue an avoidance claim.

*Id.* at 553 (emphasis added); *see also In re Weyandt*, 544 Fed. Appx. 107, 110 (3d Cir. 2013) ("[Movant] must show that derivative standing is appropriate here because the Trustee failed to carry out her Trustee duties in *declining to initiate an avoidance action* directly.") (emphasis added). If the Trustee refuses to bring an avoidance action, the court must then consider and conclude that his refusal was a breach of his fiduciary duties before it can grant derivative

12

standing. *In re Weyandt,* 544 Fed. Appx. at 110 ("[W]hen a trustee fails to comply with his or her fiduciary duties, the bankruptcy court is empowered under the Bankruptcy Code to use its equitable powers to confer derivative standing on another party."). In connection with that analysis, courts typically examine factual issues such as whether the trustee's refusal was "unreasonable" or "unjustified" and whether the claims are colorable, but in all cases, there must first be a "refusal." The United States Court of Appeals for the Sixth Circuit has stated the test as follows:

> [A] bankruptcy court may permit a single creditor in a Chapter 11 case to initiate an action to avoid a preferential or fraudulent transfer instead of the debtor-in-possession if the creditor: 1) has alleged a colorable claim that would benefit the estate, if successful, based on a cost-benefit analysis performed by the bankruptcy court; 2) has made a demand on the debtor-in-possession to file the avoidance action; 3) ***the demand has been refused***; and, 4) the refusal is unjustified in light of the statutory obligations and fiduciary duties of the debtor-in-possession in a Chapter 11 reorganization.

*In re Gibson Grp., Inc.,* 66 F.3d 1436, 1438 (6th Cir. 1995) (emphasis added). Furthermore, as the Third Circuit more recently stated:

> A derivative action is one that a bankruptcy court may authorize under its equitable powers when the Bankruptcy Code's envisioned scheme breaks down. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 553 (3d Cir.2003) (en banc).* "Even if permitted under the Bankruptcy Code, derivative standing is the exception rather than the rule." *In re Baltimore Emergency Servs. II, Corp.,* 432 F.3d 557, 562 (4th Cir.2005). . . . [Weyandt] must show that derivative standing is appropriate here because the Trustee failed to carry out her Trustee duties in declining to initiate an avoidance action directly. . . . Otherwise there would be no reason for the Bankruptcy Court to subvert the Bankruptcy Code's usual scheme and grant Weyandt derivative standing to exercise powers normally granted exclusively to the Trustee.

*In re Weyandt,* 544 Fed. Appx. at 110.

      26.    The Trustee has not refused to pursue the Alleged Skadden Claims. As was set forth above, the Trustee conducted his own investigation into the alleged underlying claims, prepared draft complaints, shared the complaints with counsel to the Lenders about 15

13

months ago and has now engaged special counsel due to the Lenders' concerns that claims may exist against Skadden to conduct a further evaluation. His special counsel is conducting its own evaluation and will report its findings to Lenders and to the Court. Unless and until the Trustee refuses to pursue the claims, the Motion must be denied as a matter of law.

C. **Lenders have not established that the Alleged Skadden Claims are colorable. Therefore, the Court should deny the Motion.**

27. Even if the Trustee had refused to bring the Alleged Skadden Claims, Lenders must still establish that the claims are "colorable". To establish a claim of legal malpractice under New York law, a plaintiff must establish: (1) attorney negligence; (2) which is the proximate cause of a loss, and (3) actual damages. *See Joseph DelGreco & Co. v. DLA Piper L.L.P*, 899 F. Supp. 2d 268, 276 (S.D.N.Y. 2012) *aff'd sub nom. In re Joseph DelGreco & Co., Inc.*, 535 F. App'x 31 (2d Cir. 2013). The Trustee's investigation on whether Skadden breached it duties to the Debtors is on-going. However, even if it did, the Lenders have still not established a colorable claim because they have not shown how the estates were damaged by Skadden's representation.

28. With respect to the transfers, even making all assumptions in favor of the Lenders, all that can be shown is that the Lenders' deficiency claim was increased. It appears there was no other damage to the estates and no harm to unsecured creditors.

D. **Lenders have not established that pursuing the Alleged Skadden Claims will benefit the Debtors' estates.**

29. Even if the Trustee had refused to bring the Alleged Skadden Claims, which he has not, Lenders must establish that prosecution of the Alleged Skadden Claims would benefit the Debtors' estates, if successful, based on a cost-benefit analysis performed by the

14

bankruptcy court. *In re Gibson Grp., Inc.,* 66 F.3d at 1438. Derivative standing is granted to benefit the estate as a whole, not merely to benefit the creditor bringing the claim. *In re Redden,* 2013 WL 5436368, at *3 (Bankr. D. Del. Sept. 30, 2013). Without a showing that that granting standing would benefit the bankruptcy estate, derivative standing is necessarily improper. *Id.*

30. Lenders have provided no cost-benefit analysis other than a bald conclusion that there is a potential to recover $30 million, of which they propose to take in excess of 75% (75% of the net recovery plus their fees and expenses). If the Trustee's investigation reveals valid claims that will benefit the unsecured creditors, there will be far better options available to the estates than to surrender 75% plus of the potential recovery to the Lenders.

E. **The doctrine of derivative standing should not apply in chapter 7 cases**.

31. *Cybergenics* was decided in the context of the context of a creditors committee seeking derivative standing in a chapter 11 case. The Third Circuit has never approved the doctrine of derivative standing in a chapter 7 case. *Cybergenics* was decided by a sharply divided panel (5-4 decision). In light of this and the Third Circuit's subsequent cautionary admonition in *In re Weyand* (discussed below) there is no basis for this court to extend the doctrine to a chapter 7 case.[4]

---

[4] Some courts have not treated chapter 7 any differently than chapter 11 when analyzing derivative standing and have permitted it. *See e.g., PW Enters., Inc. v. North Dakota Racing Comm'n (In re Racing Servs., Inc.),* 540 F.3d 892 (8th Cir. 2008); *In re Trailer Source, Inc. v. Jackson Truck & Trailer Repair, Inc.,* 555 F.3d 231, 243–44 (6th Cir.2009). In light of the Third Circuit's directive in *In re Weyandt*, however, it is unlikely that the Third Circuit would do so. *See also AMC Investors LLC v. Eugenia VI Venture Holdings Ltd,* 2012 WL 868775 (D. Del March 14, 2012)(denying a debtor's motion seeking leave to appeal where the bankruptcy court granted derivative standing to a creditor in a chapter 7 case where the trustee had consented to the suit and had no funds to pursue the action).

15

32. In *In re Weyandt*, the Third Circuit considered whether to extend the doctrine to chapter 13 cases, stating:

> In *Cybergenics*, this Court carefully considered pre-Code bankruptcy practice, the text of relevant Bankruptcy Code provisions, and policy objectives to determine that derivative standing was appropriate in some Chapter 11 bankruptcy cases. . . . At this time we do not take a position on whether derivative standing may be appropriate in some Chapter 13 contexts . . . ***We note, however, that the question of whether such an extension is appropriate would require an in-depth examination of the form and purpose of Chapter 13 bankruptcies, which Weyandt has not provided.***

544 Fed. Appx. at 110. (emphasis added). Lenders have not provided an "in depth examination of the form and purpose of Chapter [7] bankruptcies" that would warrant an extension of *Cybergenics* to chapter 7 cases. *See also Reed v. Cooper (In re Cooper)*, 405 B.R. 801 (Bankr. N.D. Texas 2009) (holding that derivative standing does not apply in chapter 7 cases); *Custom Food Group v. McCullough (In re Wilson)*, 527 B.R. 253, 257 (Bankr. N.D. Tex. 2015) ("[I]n chapter 7 cases, courts typically deny a request for derivative standing from a creditor who has independently pursued an avoidance action."); *In re Chapman Lumber Co., Inc.*, 343 B.R. 217, 221 (Bankr. N.D. Iowa 2006). Accordingly, the Motion should be denied.

33. Furthermore, the form and purpose of chapter 7 cases do not warrant an extension of *Cybergenics*. In chapter 11 cases, there is a statutory basis (e.g., 11 U.S.C. §§ 1103(c)(5), 1109(b) and 1123(b)(3)(B)) for the court's power to authorize derivative standing and an equitable rationale for exercising that authority. *In re Cooper*, 405 B.R. at 804.

34. Lenders cite no statutory authority that authorizes the grant of derivative standing in chapter 7 cases. Instead Lenders cite Bankruptcy Code section 1109 and the court's equitable powers codified at Bankruptcy Code section 105(a) as their bases for relief. Section

16

1109(b) provides, "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." Section 1109 applies in chapter 11 cases, not chapter 7 cases. In *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A*, 530 U.S. 1 (2000), the Supreme Court held that trustees are the only parties who may surcharge a secured creditor's collateral under Bankruptcy Code section 506(c), rejecting an administrative claimants argument that section 1109 evidences the right of a nontrustee to recover under section 506(c) for insurance premiums it had paid prior to the conversion of the case from chapter 11 to chapter 7. In doing to, the Court noted:

> We are not persuaded. That section, which provides that a "party in interest" "may raise and may appear and be heard on any issue in a case under [Chapter 11]," is by its terms inapplicable here, since petitioner's attempt to use § 506(c) came after the bankruptcy proceeding was converted from Chapter 11 to Chapter 7. In any event, we do not read § 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to other specific parties. Cf. 7 L. King, Collier on Bankruptcy & ¶ 1109.05 (rev. 15th ed. 1999) ("In general, section 1109 does not bestow any right to usurp the trustee's role as representative of the estate with respect to the initiation of certain types of litigation that belong exclusively to the estate").

*Id.* at 8-9.

35. Lenders also cite Bankruptcy Code section 105(a), which codifies a bankruptcy court's equitable powers and authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or

DOCS_DE:205947.3 31265/001

appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). A bankruptcy court may not exercise its "broad equitable powers" under section 105(a), however, in a manner that is inconsistent with the other, more specific provisions of the Bankruptcy Code. *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014) ("It is hornbook law that § 105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.'") Pursuant to Bankruptcy Code section 323, the trustee is the sole representative of the Debtors' bankruptcy estate with the capacity to sue and be sued.

      36.     As to any equitable grounds, a chapter 7 trustee simply does not have the same conflicts in bringing suit that justify a grant of derivative standing in chapter 11 cases. Unlike management of a debtor-in-possession who might be reluctant to sue an insider, a chapter 7 trustee is an independent fiduciary who does not have such conflicts. As the bankruptcy court noted in *In re Cooper*:

> In Chapter 7, unlike Chapter 11, there is always a trustee in place. There is not the potential for a conflicted board of directors pulling its punches. There is not the risk of the proverbial fox guarding the henhouse. The trustee does not have the potential for conflicts of interest that a debtor-in-possession sometimes has, since the trustee has no prepetition relationship with the debtor's management, shareholders or creditors. The trustee has a unique role as an independent fiduciary, with a completely different perspective and interest in a bankruptcy estate than either a debtor or an individual creditor. The trustee also is expected to be a gatekeeper and to exercise reasonable business judgment in deciding what actions to bring and what are not worth the expense. In theory at least (and hopefully in reality), the trustee is a fair, balanced, and experienced (not to mention bonded, *see* 11 U.S.C. § 322) official who can be depended upon to exercise good litigation judgment. Because of the unique role of a trustee, there would seem to be no equitable rationale to deviate from the Bankruptcy Code's apparent remedial scheme *vis-a-vis* avoidance actions and other estate causes of action. If creditors do not like the job the trustee is doing, they can file a motion to compel him or her to act, or a motion for removal of the trustee (11 U.S.C. § 324). In the context of such a motion, the court can scrutinize the business judgment and litigation zeal (or lack thereof) that is being exercised by the trustee. But

DOCS_DE:205947.3 31265/001

simply allowing a creditor—a non-statutory fiduciary—to go forward in the Chapter 7 trustee's stead could facilitate a creditor "hijacking" a Chapter 7 bankruptcy case in a manner that Congress did not envision.

*In re Cooper,* 405 B.R. at 812.

37. The purpose of a chapter 7 bankruptcy-the orderly liquidation of the debtor's assets and the payment of creditors claims in accordance with the priority scheme of the Bankruptcy Code also does not justify the application of derivative standing. In a chapter 11 reorganization case, the purpose is to reorganize the company, restructure its business and financial obligations and continue operating. In this case, management might be disincentivized to sue to recover a preference from a vendor who is critical to the business going forward, and derivative standing might be appropriate. A chapter 7 trustee does not have that conflict.

38. Accordingly, the Court should decline to extend the doctrine of derivative standing to chapter 7 cases.

F. **Should the Court authorize Lenders to prosecute the Alleged Skadden Claims, Lenders still may not assert or waive the attorney-client privilege, which right belongs solely to the Trustee.**

39. Lenders ask this Court for authority to assert or waive the attorney-client privilege. The trustee holds the debtor's attorney-client privilege. *Commodity Futures Trading Com'n v. Weintraub,* 471 U.S. 343, 358 (1985)(holding that a chapter 7 trustee holds the debtor's attorney-client privilege as to pre-bankruptcy communications and is the proper party to waive or assert that privilege). Lenders have not cited one case in which a creditor or a creditors committee who has been granted derivative standing to pursue an action on behalf of the estate were given the power to assert or waive the debtor's attorney-client privilege. Indeed the two

19

cases in which courts have considered whether a creditors' committee with derivate standing can assert the debtor-in-possession's attorney-privilege have held that it cannot. *See Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman,* 342 B.R. 416 (S.D.N.Y. 2006); *In re Big M, Inc.,* 2013 WL 1681489, *1 (Bankr. D. N.J. April 17, 2013) ("While courts have recognized that a debtor's right to assert or waive the attorney-client privilege against discovery is passed to the estate or an appointed trustee upon filing for bankruptcy, or the subsequent appointment of a trustee, such a power does not extend to a creditors' committee that asserts causes of action on behalf of the estate.").

## Conclusion

40.    For the foregoing reasons, the Trustee respectfully requests that the Court deny the Motion.

Dated:   March 21, 2016

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Bradford J. Sandler*
Dean A. Ziehl (CA Bar No. 84529)
Bradford J. Sandler (DE Bar No. 4142)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:     dziehl@pszjlaw.com
           bsandler@pszjlaw.com
           pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee